UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 93-8855
_____

JAMES CARL LEE DAVIS,

Petitioner-Appellee,
Cross-Appellant,

VERSUS

WAYNE SCOTT, Director,
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellant,
Cross-Appellee.

_____

Appeals from the United States District Court
for the Western District of Texas
_____

(April 19, 1995)

Before KING, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The State of Texas appeals the district court's conditional grant of habeas relief to James Carl Lee Davis, including conditional commutation of his death sentence, based upon his contention that the two Texas statutory special issues submitted to the jury, during the punishment phase of his trial, prevented it from giving effect to mitigating evidence of, *inter alia*, mental instability, in violation of the Eighth and Fourteenth Amendments, and as held in *Penry v. Lynaugh*, 492 U.S. 302 (1989). Davis cross-appeals, contending that the rule announced in *Teague v. Lane*, 489 U.S. 288 (1989), does not bar him from challenging collaterally how

the punishment phase of his trial, as well as jury *voir dire*, were affected unconstitutionally by the statutory proscription against disclosing to the jury or venire the effect of a hung jury on the special issues.  We **AFFIRM** in part, **REVERSE** in part, and **REMAND** with instructions to deny relief.

## I.

Early on March 3, 1984, Davis entered the home of his neighbor, Pauline Johnson, without permission, and brutally attacked her young children.  As a result, three of the four children died due to multiple skull fractures.  Based on the death of one of the children, Yvette, who exhibited evidence of sexual assault, a jury convicted Davis of capital murder.[1]

During the punishment phase of the trial, and after the presentation of additional evidence, the court instructed the jury to answer two of the three Texas statutory special issues (quoted *infra*).  Because the jury unanimously answered both issues in the affirmative, the trial court assessed punishment as death by lethal injection.  The Texas Court of Criminal Appeals affirmed, ***Davis v. State***, 782 S.W.2d 211 (Tex. Crim. App. 1989); the United States Supreme Court denied *certiorari*.  ***Davis v. Texas***, 495 U.S. 940 (1990).

Davis sought habeas relief in Texas state court.  After making findings of fact and conclusions of law, the state judge (who presided at Davis' trial) recommended denial of habeas relief; and,

---

[1]     The facts are stated more completely in ***Davis v. State***, 782 S.W.2d 211, 219-20 (Tex. Crim. App. 1989), *cert. denied*, 495 U.S. 940 (1990).

in an unpublished opinion, the Texas Court of Criminal Appeals denied that relief.

In September 1992, pursuant to 28 U.S.C. § 2254, Davis sought federal habeas relief. After the State moved for summary judgment, the matter was referred to a magistrate judge, who recommended granting the motion. But, in November 1993, relying on intervening case law, the district court declined to follow the recommendation.[2] It believed that Davis had raised a **Penry** claim -- that there existed a reasonable likelihood that the jury applied the special issues in a way that prevented it from considering the mitigating effect of childhood abuse, psychological disorders, and mental retardation. It ordered the commutation of his death sentence, unless the State appealed to this court or conducted a new sentencing hearing within 180 days. On the other hand, the district court held that **Teague** prohibited it from considering Davis' contentions that TEX. CODE CRIM. PROC. art. 37.071(g) (Supp. 1986) (proscribing disclosure to a venireman or juror about the effect of a hung jury on the special issues) affected unconstitutionally the punishment phase of his trial, as well as jury *voir dire*.

---

[2]    The district court's opinion is based in large part on **Motley v. Collins**, 3 F.3d 781 (5th Cir. 1993) (**Motley I**) which was decided after the magistrate's report and recommendation. Subsequently, **Motley I** was superseded by **Motley v. Collins**, 18 F.3d 1223 (5th Cir.), *cert. denied*, 115 S. Ct. 418 (1994), thus, changing the basis for the district court's conditional grant of habeas relief.

The State challenges the ruling on the **Penry** claim; Davis, the rejection of the issues concerning article 37.071(g). "In considering a federal habeas corpus petition presented by a petitioner in state custody, federal courts must afford a presumption of correctness to any state court factual findings. *See* 28 U.S.C. § 2254(d). We review the district court's findings of fact for clear error, but decide any issues of law de novo." **Barnard v. Collins**, 958 F.2d 634, 636 (5th Cir. 1992), *cert. denied*, 113 S. Ct. 990 (1993). "Evaluation of a petitioner's constitutional challenge to the Texas special issues as applied to him is, of course, an issue of law." **Madden v. Collins**, 18 F.3d 304, 306 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1114 (1995).

Needless to say, because Davis seeks habeas relief, "`we must determine, as a threshold matter, whether granting him the relief he seeks would create a "new rule"' of constitutional law" under **Teague**. **Graham v. Collins**, 506 U.S. ___, ___, 113 S. Ct. 892, 897 (1993) (quoting **Penry**, 492 U.S. at 313); *accord* **Motley v. Collins**, 18 F.3d 1223, 1230 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 418 (1994).

> Under **Teague**, a "new rule" is one which "`imposes a new obligation on the States or the Federal Government'" or was not "`dictated by precedent existing at the time the defendant's conviction became final.'" [**Graham**, 506 U.S. at ___, 113 S. Ct. at 897] (quoting **Teague**, 489 U.S. at 301, 109 S. Ct. at 1070). As the Supreme Court aptly noted, it is extremely difficult "`to determine whether we announce a new rule when a decision extends the reasoning of ... prior cases.'" **Id.** (quoting

> *Saffle v. Parks*, 494 U.S. 484, 488, 110 S. Ct.
> 1257, 1260, 108 L.Ed.2d 415 (1990)).  Nonetheless,
> we are instructed that "unless reasonable jurists
> hearing [Davis'] claim *at the time his conviction
> became final* `would have felt compelled by existing
> precedent' to rule in his favor, we are barred from
> doing so now."  *Id.* (quoting *Saffle*, 494 U.S. at
> 488, 110 S. Ct. at 1260) (emphasis added).

*Motley*, 18 F.3d at 1230.  First, we consider the *Penry* issue.

## A.

The two Texas special issues submitted to the jury during the punishment phase of trial were:

> (1)  Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

> (2)  Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

In *Penry*, decided before Davis' conviction became final, the Supreme Court held that when a capital defendant introduces evidence about his background, character, or circumstances that reflects a reduced personal culpability, *and* the jury cannot give effect to the mitigating force of that evidence in response to Texas' special issues, the trial court must, upon request, provide instructions that allow the jury to consider and give mitigating effect to that evidence.  *Penry*, 492 U.S. at 319-28.[3]  Penry had

---

[3]   "[I]n a case such as this, which was tried before *Penry* was decided, the petitioner need not have requested an instruction on mitigating evidence, nor must he have objected to the lack of such an instruction."  *Motley*, 18 F.3d at 1229; *see Selvage v. Collins*, 897 F.2d 745 (5th Cir. 1990), *certifying question to* 816 S.W.2d 390

- 5 -

presented evidence that childhood abuse and mental retardation left him unable to learn from his mistakes, but that the special issues failed to give the jury a vehicle for taking this into consideration. *Id.* at 308.

Likewise, Davis maintains that the special issues failed to give the jury a vehicle by which it could properly consider and give effect to evidence tending to mitigate his culpability for the murder of Yvette Johnson. He contends that evidence of mental instability and childhood abuse indicates that he was prevented, like Penry, from learning from his mistakes. "To grant relief on a *Penry* claim, we must determine (1) that the ... evidence was constitutionally relevant mitigating evidence, and, if so, (2) that the ... evidence was beyond the `effective reach' of the jurors." *Madden*, 18 F.3d at 308 (emphasis omitted). For the several alternate reasons discussed below, we conclude that Davis' *Penry* claim fails.

**1.**

> The first inquiry in a *Penry* claim is whether the mitigating evidence is relevant. Phrased differently, does the evidence implicate the basic concern of *Penry* "that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

*Madden*, 18 F.3d at 307 (quoting *Penry*, 492 U.S. at 319); *accord* *Allridge v. Scott*, 41 F.3d 213, 223 (5th Cir. 1994); *Motley*, 18

---

(Tex. Crim. App. 1991) (failure to request or object does not bar procedurally a *Penry* claim when the trial occurred prior to *Penry*). As discussed *infra*, Davis did receive an instruction on mitigation; he asserts it was insufficient.

F.3d at 1235 n.10. In short, evidence of a disadvantaged background, or emotional and mental problems, does not raise, *ipso facto*, a **Penry** claim. In order to present relevant evidence that one is less culpable for his crime, the evidence must show (1) a "uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own", *Graham v. Collins*, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), *aff'd on other grounds*, 506 U.S. ___, 113 S. Ct. 892 (1993), and (2) that the criminal act was attributable to this severe permanent condition. *Madden*, 18 F.3d at 307.

As noted, this court has made it clear that, for evidence to have mitigating relevance to the special issues, there must be a nexus between the mitigating evidence and the criminal act. For example, in *Madden*, a clinical psychologist testified that Madden suffered from an emotional disorder (specifically, an anti-social personality). Madden failed, however, to elicit any testimony that a person with such a disorder is more aggressive or violent than an unafflicted person, or that he, in particular, was more aggressive or violent because of the disorder. Also absent was evidence that Madden was incapable of controlling his impulses or unable to distinguish right from wrong. Based upon this, our court determined there was insubstantial evidence that Madden's criminal actions were attributable to his anti-social personality. *Id.*

Davis asserts that his mental instabilities were "acted out" during the crime, thus, demonstrating a connection between the crime and his condition. Specifically, he contends that a nexus is

indicated between his "diagnosed condition of paranoid schizophrenia, psychotic disorders and violent sexual proclivities" and the crime because "the offense was committed against female children during a bizarre sexual attack."[4] After reviewing the state court's findings, the district court's findings, and the record, we conclude, as hereinafter discussed, that Davis failed to present the requisite "constitutionally relevant mitigating evidence". We address in turn the evidence on (1) paranoid schizophrenia and psychotic disorders, (2) violent sexual proclivities, and (3) abusive childhood.

**a.**

At the punishment phase, court-appointed psychiatrist Dr. Richard Coons, who examined Davis just prior to trial, testified that Davis suffered from a personality/behavioral disorder. Based

---

[4] Two observations are called for by this claim. First, Davis appears to change position on whether he is mentally retarded. In any event, the findings of fact on Davis' habeas petition by the state judge (who presided at Davis' trial) were that Davis was not. As noted, we are required to give a presumption of correctness to those findings. The court stated:

> This Court finds no evidence that [Davis is] mentally retarded. There is evidence of behavioral disorders.... There are some references to the presence of brain damage in the applicant at the age of seven; however, in 1976 a physician's report [found], "Brain damage is *not* present." [Emphasis in original physician's report.] This Court find[s] no evidence of an organic brain disorder.

Second, Davis' contention that his sexual proclivities were acted out during the offense because it was committed against "female children during a bizarre sexual attack" is inconsistent with the facts surrounding the murders. Only one of his victims, Yvette Johnson, was female and assaulted sexually. The other two victims, her brothers, did not exhibit any evidence of sexual assault.

upon his review of Davis' medical files, Dr. Coons opined that Davis did not suffer from paranoid schizophrenia or any other psychotic disorder.

In addition, even assuming Davis presented evidence that he suffered from paranoid schizophrenia or some other psychotic disorder, he failed to present any evidence linking that condition to the crime. Such a situation would be similar to that in **Madden**, where, as noted, Madden failed to present evidence that he was more aggressive or violent because of his anti-social personality, or that he was incapable of controlling his impulses, or unable to distinguish right from wrong. Likewise, Davis failed to link any psychiatric problems he may have suffered to the murder of Yvette Johnson.

### b.

On the other hand, the evidence adduced during the trial does indicate that Davis had engaged previously in sexually deviant behavior. After undergoing foot surgery at age six, Davis spent the next several weeks in the hospital. His medical records reveal that, during this period, the nurses reported that he continually made obscene statements, constantly referred to sexual matters, expressed his desire to have sexual relations with them, and masturbated frequently in front of them and other patients. At age 13, Davis was arrested for the attempted rape of a 35-year-old woman who lived in his neighborhood. This evidence above, however, does not establish a uniquely severe and permanent handicap from a

- 9 -

violent sexual proclivity, nor that the criminal act was attributable to any such condition.

### c.

In **Barnard**, "we recognized that an abused childhood could rise to the level of a **Penry** claim if the traumatic events caused psychological effects to which the criminal conduct was attributable." **Madden**, 18 F.3d at 308. As the district court noted, "there is no documented *medical* evidence of Davis' childhood abuse". (Emphasis by district court.) There is evidence, however, of parental neglect; and medical records indicate that Davis may have been subjected to abuse. Oftentimes, his mother would leave her six young children alone at home for days at a time. (But, at other times, Davis would be left with his grandmother.) Once, when Davis cut his hand severely, his mother waited two days before taking him to the hospital; this delay prevented the doctors from being able to suture the wound.

Davis' reliance solely upon medical records from his youth does not establish **Penry**-type evidence. There is no evidence that these incidents were of such a traumatic nature as to cause psychological effects, let alone, that Davis' criminal act was attributable to any resulting psychological problems.

In sum, even if we assume that Davis suffered from the claimed conditions, conspicuously absent at trial was any evidence tending to link these conditions with the crime.[5] Although there was

---

[5] For example, one of the "conditions" Davis relies upon to mitigate his culpability is the fact that he was born a "blue baby". At oral argument, his attorney stated that this condition

evidence of behavioral and mental problems, Davis failed to demonstrate how the crime was attributable to them. Needless to say, conclusory assumptions do not create a nexus. Accordingly, we conclude that there is insubstantial evidence that Davis either suffered from a uniquely severe and permanent handicap, or that his criminal actions were attributable to any such condition. Thus, on this basis alone, the *Penry* claim fails.

## 2.

In the alternative, even assuming that Davis presented constitutionally relevant mitigating evidence, he failed to satisfy the second prong for relief on a *Penry* claim: that this evidence was beyond the effective reach of the jury. We examine each of the two special issues. But, before doing so, we note that, after instructing on the two special issues, the trial court instructed also that "[e]vidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answers to either of the [special] issues".[6]

---

"sounds bad to me. And if he's blue it means lack of oxygen and possible brain damage." Davis fails to demonstrate how his criminal conduct was attributable to such a condition.

[6] We note also that, in 1991, approximately six and one-half years after Davis' trial, the Texas legislature amended the special issues statute to address the problem raised by *Penry*. Specifically, TEX. CODE CRIM. PROC. art. 37.071, § 2(d) (Supp. 1995), provides that:

> The court shall charge the jury that:
> (1) in deliberating on the [special] issues ...,
> it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition

As quoted, the first special issue asks whether the defendant acted "deliberately and with reasonable expectation that the death of the deceased ... would result?" The court instructed that "deliberately" meant "a manner of doing an act characterized by or resulting from careful consideration: `a conscious decision involving a thought process which embraces more than mere will to engage in the conduct'". As discussed below, and based upon this instruction and the mitigation instruction quoted above, we conclude that Davis' jury had an appropriate vehicle to consider his allegedly mitigating evidence; to require an additional (third) instruction for Davis would be to create a new rule of constitutional law on collateral review.

In examining the first special issue, we are mindful of the basic concern of *Penry*, mentioned earlier: "that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse". *Penry*, 492 U.S. at 319. Thus, the gist of *Penry* deals with the ability of a jury to consider a defendant's culpability and, in determining whether death is an appropriate punishment, to be able to exercise a "reasoned moral response" to evidence tending to mitigate that culpability.

---

of the death penalty.

*See* **Graham**, 950 F.2d at 1012 n.1 (discussion of the 1991 amendment).

Unlike the present case, however, the ***Penry*** jury was not instructed on the meaning of "deliberately". Proceeding on the assumption that the jury understood "deliberately" to mean something more than "intentionally", the Court recognized that "[b]ecause Penry was mentally retarded ... and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, ... [a] juror could ... conclude that Penry was less morally `culpable than defendants who have no such excuse,' but who acted `deliberately' as that term is commonly understood". ***Penry***, 492 U.S. at 322-23 (quoting ***California v. Brown***, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). The "juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime `deliberately'". ***Id.*** at 323.

In short, the fault with the first special issue in ***Penry*** was that it failed to clarify the term "deliberately". The Court concluded that

> [i]n the absence of jury instructions defining "deliberately" in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue.

***Penry***, 492 U.S. at 323.

On the other hand, the definition of "deliberately" provided to Davis' jury would have clearly directed Penry's jury to consider

- 13 -

his mitigating evidence and how it bore on his personal culpability.  As noted, under the special issues, Penry's jury was foreclosed from considering his inability "to control his impulses or to evaluate the consequences of his conduct".  Had the **_Penry_** jury been instructed, as it was in this case, that it could consider evidence presented in mitigation of the penalty, as well as that "deliberately" was "characterized by or resulting from _careful consideration_", it would have been able to consider his uncontrollable impulses or lack of evaluation.  (Emphasis added.)[7]

---

[7]    During the punishment phase's closing argument, Davis' attorney homed in on the phrase "careful consideration" from the instruction defining "deliberately" for the jury to consider when addressing the first special issue:

> The two words that are so critical to deciding this question are "careful consideration".  In other words, before you can answer [the first special issue] yes, you have to be convinced beyond any reasonable doubt that James Davis carefully considered what he was going to do before he did it.  Okay?  If he carefully considered what he was going to do before he did it.  And I submit to you that the evidence in this case, gruesome though it may be, simply does not show that he carefully considered anything.  I submit to you right now that there is a reasonable doubt on that issue, and you're going to have to answer that question no.
>
> ....
>
> The upshot of all of these [medical] records is that James Davis' mind is so diseased or damaged or whatever that, quite frankly, ladies and gentlemen, he's incapable of carefully considering anything.

After suggesting that Davis may have been under the influence of drugs or alcohol, his attorney continued:

> [The prosecution] says we haven't brought you any experts to tell you that.  I mean, do we need to bring an expert on something like that?  Of

- 14 -

In sum, these additional instructions provided Davis' jury with a sufficient means to consider his mitigating evidence. To hold that they were inadequate would require us to announce a new rule of constitutional law on collateral review -- which we are foreclosed from doing under **Teague**.

**b.**

Having determined that the jury had an adequate means, through the first special issue, to consider Davis' mitigating evidence, we need not consider whether the second special issue -- continuing threat or dangerousness -- provided another, separate, adequate means. *See **Clark v. Collins***, 19 F.3d 959, 963 n.14 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 432 (1994). But, in the alternative, we turn to that second issue. It concerns whether, in the future, "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society".

As discussed, even if the evidence is aggravating, as long as the mitigating aspect is within the effective reach of the jury,

---

> course not. Drugs or alcohol, in an already clouded mind like that, has to just take whatever little control he's got and throw it out the window. Who knows what he was under?

The attorney concluded his comments regarding the first special issue:

> Can you say beyond a reasonable doubt that James Davis carefully considered what he was going to do before he did it? No. Given his crippled mind, and given what the facts of the offense show, and what they don't show, there is no way to escape that doubt. I submit to you that question should be answered no.

the requirements of the Eighth Amendment are satisfied.  In *Johnson v. Texas*, 113 S. Ct. 2658, 2669 (1993), the Court noted that the *only way* the evidence of Penry's mental condition could be considered within the second special issue (future dangerousness) was as an aggravating factor.  *Id.* at 2669-70.  On the other hand, as also discussed, a *Penry* claim does not arise when constitutionally relevant evidence "can be given mitigating effect *in some way* under the Texas special issues".  *Motley*, 18 F.3d at 1234 (emphasis in original).

As noted, Davis failed to present any constitutionally relevant mitigating evidence.  Even so, the background evidence that he did present does not demonstrate that he was unable to learn from his mistakes.  To the contrary, it demonstrated that he responded positively to a structured environment.

Gerald Frank McKimmey, who was the chief social worker at Austin State Hospital's adolescent unit, dealt with Davis during a 1979 admission when Davis was 16 years of age.  McKimmey testified that Davis did well in the structured environment at the unit.[8]

---

[8]    At the punishment phase, on direct examination by Davis' attorney, McKimmey testified as follows:

> Q    Was [Davis] a violent, mean, bullyish [sic] type kid, as these kids went?  Put that in context for us.
>
> A    No, he was not a mean, bullyish [sic] kind of kid.  He was fairly successful in our program, as a matter of fact.  He was quite successful. We have a level system of graduated -- a level system, whereby we can provide kids with feedback as to what their behaviors are and what kind of behaviors they need to change. And [Davis] was able to negotiate that system

Additionally, McKimmey read Davis' social history report that was prepared upon his admittance to the unit.  Under recommendations, the report stated: "a proper placement outside the home can be obtained for this patient and he can gain some direction in a positive way.  He has insight to this need and indicates he wants to find somewhere else to go other than into the home."

David Adcock, Davis' special education teacher in the sixth and seventh grades, testified that, although Davis was learning disabled and had low self-esteem, he was a "tender-hearted, a very kind young man".  Another teacher at this same time described Davis as "cooperative ... very creative, very calm, anxious to please".

---

quite well.

....

Q   ...  Did [Davis] seem to like the structure and the reward system?

A   Quite well.

Q   Did he respond to that?

A   Yes, he did like it.  He liked it in the sense that he did quite well at it, and -- [y]es, he did.

McKimmey also discussed a five-color coding system the adolescent unit utilized to identify to the patients their progress.  He identified green as the highest color but described it as "fairly rare, because when somebody reaches that high, they're ready to go. In other words, they're doing quite well".  Later, McKimmey testified that "[Davis] had achieved the highest color level in our system".  Subsequently, Davis was downgraded because of an incident at the unit, but McKimmey dismissed this as a "phenomenon on adolescent treatment units" wherein the patient causes an incident upon learning that they are scheduled to be discharged.  It is an attempt, by the patient, to stay in the unit.

The evidence Davis did present indicates that, despite whatever condition he may have suffered under, Davis was subject to change and was not unable to learn from his mistakes. Based on this evidence, and the earlier quoted mitigating instruction, Davis' jury was not "compelled" to answer the second special issue in the affirmative; it could give mitigating effect to what evidence there was regarding his condition.[9]

In conclusion, there are independent bases for concluding that the **Penry** claim fails: (1) Davis failed to present constitutionally relevant mitigating evidence; but, assuming it was presented, that evidence was not beyond the effective reach of the jury under either (2) the first (deliberate act) or (3) second (continuing dangerousness) special issues. Because Davis does not make a claim within the ambit of **Penry**, he is seeking a new rule of constitutional law on collateral review. Accordingly, his claim is barred by **Teague**, and we **REVERSE** the district court on this issue.

---

[9] For example, during closing argument at the punishment phase, Davis' attorney acknowledged that Davis functioned well in a structured environment:

> Let's focus on this future dangerousness as it really is in the concrete world. He -- If he is not given the death penalty, he is going to serve a life sentence in the Texas Department of Corrections. That is his future environment that we are talking about, and I don't need to tell anybody that it is a very structured environment.
>
> ....
>
> But one of the main themes that you will see all through these reports is that when you put this little boy, or this teenager, or whatever he was at that stage, in a situation with a lot of structure, he did pretty damn good. He did good.

**B.**

The trial court instructed the jury that if it answered both special issues "yes", the sentence would be death; if it answered "no" to either, or both, the sentence would be confinement for life. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071(e) (Supp. 1986).[10] It then instructed: "You may not answer any issue `yes' unless you agree unanimously. You may not answer any issue `no' unless ten or more jurors agree." *See* TEX. CODE CRIM. PROC. ANN. art. 37.071(d) (Supp. 1986). But, pursuant to Texas law, it did not inform the jury that if it was unable to answer either special issue, Davis would be sentenced to life imprisonment. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071(g) (Supp. 1986).[11]

---

[10]    TEX. CODE CRIM. PROC. ANN. art. 37.071(e) (Supp. 1986) provided:

> If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or is unable to answer any issues submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life.

As noted, the Texas legislature amended the special issues statute in 1991. This provision is codified presently, in a modified form, at TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(g) (Supp. 1995).

[11]    In other words, if the jury could not satisfy the requirements of the "12-10 Rule", then a "hung jury" would result and Davis would be sentenced to life imprisonment. TEX. CODE CRIM. PROC. ANN. art. 37.071(g) (Supp. 1986) provided, in pertinent part:

> The court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this article.

This provision is codified now, in substance, at TEX. CODE CRIM. PROC.

- 19 -

Davis' cross-appeal centers on the statutory proscription in article 37.071(g), imposed on the court and counsel, that precludes them from disclosing to the jurors or veniremen the effect of the failure to agree on a special issue. Davis contends that this proscription affected impermissibly the punishment phase of his trial, as well as jury *voir dire*. In raising his challenge to article 37.071(g), he maintains that he is seeking a "reasonable interpretation" of past precedent, not a new rule barred by **Teague**.

## 1.

As a preliminary matter, we turn to Davis' contention that the district court erred in even considering whether his challenge to article 37.071(g) was foreclosed by **Teague**. He maintains that, because the State did not raise the **Teague** bar in either its response to his habeas petition or its summary judgment motion, the district court should not have considered **Teague** *sua sponte*.

Davis recognizes, however, that, even if the State does not raise **Teague**, a court still has discretion to consider it. "[A] federal court may, but need not, decline to apply **Teague** if the State does not argue it." **Caspari v. Bohlen**, ___ U.S. ___, ___, 114 S. Ct. 948, 953 (1994); *see also* **Schiro v. Farley**, ___ U.S. ___, ___, 114 S. Ct. 783, 788 (1994). But, Davis contends that, under the facts of this case, the district court abused its

---

art. 37.071, § 2(a) (Supp. 1995).

- 20 -

discretion.  He fails, however, to develop this contention; and, we fail to see any abuse of discretion.[12]

## 2.

As noted, the statutory proscription foreclosed the jury from being advised on the effect of a hung jury on either of the special issues.  Davis maintains that such a limitation deprived the jury of relevant and material information that was crucial in its deliberative process.

In *Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993), we rejected a virtually identical contention.  Webb contended that the statutory proscription violated the Eighth and Fourteenth Amendments;[13] but we held that consideration of such a claim was precluded by *Teague*. *Id.* at 96.  Davis attacks *Webb* as "incorrectly decided".  In addition to claiming this is not a "new rule", he tries to distinguish *Webb* by contending that it should have been decided based on a procedural bar, not on the basis of *Teague*.

"[T]here can be no dispute that a decision announces a new rule if it expressly overrules a prior decision." *Graham*, 506 U.S. at ___, 113 S. Ct. at 897.  In any event, despite Davis' protestations, *Webb* is controlling precedent. *E.g.*, *Washington v.*

_____

[12]  We need not address, nor do we decide, the State's contention that *Graham* may require *sua sponte* analysis of *Teague*. *See Graham*, 506 U.S. at ___, 113 S. Ct. at 987; *Nethery v. Collins*, 993 F.2d 1154, 1162-63 (5th Cir. 1993) (King, J., dissenting), *cert. denied*, 114 S. Ct. 1416 (1994); *but see Schiro*, ___ U.S. at ___, 114 S. Ct. at 789 ("Although we undoubtedly have the discretion to reach the State's *Teague* argument, we will not do so in these circumstances").

[13]  Davis claims the proscription violates also the Fifth and Sixth Amendments.

*Watkins*, 655 F.2d 1346, 1354 n.10 (5th Cir. 1981) (prior panel decision binds subsequent panel unless intervening *en banc* or Supreme Court decision), *cert. denied*, 456 U.S. 949 (1982).

### 3.

Davis asserts next that the prohibition against informing a venireman of the effect of a hung jury deprived him of adequate and proper information on which to exercise a peremptory challenge.  He claims that such an impediment to defense counsel's information seeking process during *voir dire* constitutes constitutional error.[14]

Regardless, Davis fails to identify any precedent indicating that he is not seeking a new rule on collateral review.  Although defense counsel is entitled to question veniremen in order to exercise peremptory challenges intelligently, Davis has failed to demonstrate how disclosing the provisions of article 37.071(e) to a venireman affects this process.  Concerns regarding whether a venireman will stand firm in the face of overwhelming opposition from fellow jurors can adequately be addressed without disclosing to that venireman the statutory effect of three or more "no" votes.  Accordingly, Davis' second challenge to article 37.071(g) is foreclosed by *Teague*.

---

[14]    Davis' contention assumes that juror bias or misconception automatically derives from disallowing the venire to be informed of the effect of a deadlock.  In essence, if a defendant is permitted to disclose the effect of a hung jury on the special issues to a venireman, his counsel would be able to sift through the venire to locate a single "no" vote.

Under **Teague**, new rules may be applied in habeas proceedings only if they come within "one of two narrow exceptions". **Saffle**, 494 U.S. at 486. The first exception applies to new rules that place an entire category of conduct beyond the reach of the criminal law or addresses a "substantive categorical guarante[e] accorded by the Constitution". **Id.** at 494 (quoting **Penry**, 492 U.S. at 329). The second exception applies to new "watershed rules of criminal procedure" that are necessary to the fundamental fairness and accuracy of the criminal proceeding. **Id.** at 495. Davis claims the latter exception is implicated in this case.

Davis failed, however, to raise this issue before the district court. Accordingly, this claim is not properly before us, and should not be considered for the first time on appeal. **Earvin v. Lynaugh**, 860 F.2d 623, 628 (5th Cir. 1988), *cert. denied*, 489 U.S. 1091 (1989). Even if this claim were properly before us, and as this court noted in **Sawyer v. Butler**, 881 F.2d 1273 (5th Cir. 1989) (en banc), *aff'd sub nom. **Sawyer v. Smith**, 497 U.S. 227 (1990), the second **Teague** exception is designed to redress constitutional violations that "so distort the judicial process as to leave one with the impression that there has been no judicial determination at all, or else skew the actual evidence crucial to the trier of fact's disposition of the case". **Id.** at 1294. "A rule that qualifies under this exception must not only improve accuracy, but also `"alter our understanding of the *bedrock procedural elements*"' essential to the fairness of a proceeding." **Sawyer**, 497 U.S. at

242 (quoting *Teague*, 489 U.S. at 311 (quoting *Williams v. United States*, 401 U.S. 675, 693 (1971) (Harlan, J., concurring in judgments in part and dissenting in part))). Davis has failed to demonstrate that the proscription of article 37.071(g) is of such a nature as to "so distort" the accuracy of the jury's answers to the special issues.

## 5.

Noting that he has challenged the constitutionality of article 37.071(g) at every stage (trial, on direct appeal, in his petition for *certiorari*, and in his state and federal habeas proceedings), Davis encourages this court to create an additional exception to *Teague*: if a defendant demonstrates that he has raised his constitutional complaint in every forum, and it has been rejected (for reasons other than delay or procedural default), then, notwithstanding *Teague*, a federal court should review the merits of his challenge.

As before, Davis raises this for the first time on appeal. Regardless, in essence, he is not asking us to fashion an additional *Teague* exception. Rather, his contention is but a further attempt to have us apply the second *Teague* exception; one he does not meet.

## III.

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** with instructions to deny habeas relief.