IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,228






EX PARTE LAROYCE LATHAIR SMITH, Applicant






ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM DALLAS COUNTY






 Cochran, J., delivered the opinion of the Court, joined by Keller, P.J.,
Meyers, Womack and Johnson, JJ. Hervey, J., filed a concurring opinion, joined by
Keasler, J. Holcomb, J., filed a concurring opinion, joined by Price, J.



O P I N I O N 
 

 

 We deny habeas corpus relief in this case because there was no constitutional infirmity
in applicant's capital-murder punishment-phase jury instructions. First, applicant's mitigation
evidence was not Penry I evidence; therefore, the jury could give effect to this evidence within
the scope of the two special issues. Second, we find no error in the trial court's supplementary
nullification instruction. 

 I.


 In 1991, a Dallas County jury convicted applicant of capital murder for the robbery-murder of Jennifer Soto. During the punishment phase, applicant introduced evidence that he
had a difficult family life as a child and that he was mentally slow, though not mentally
retarded. Under the law in effect at the time of the trial, the jury was then given two special
issues during the punishment phase: First, was the killing deliberate? And second, does the
defendant pose a continuing danger to others? Because this trial took place during that two-
year hiatus between the Supreme Court's decision in Penry I (1) and the Texas Legislature's
enactment of a new statutory special issue in response to Penry I, (2) the trial judge also gave the
jury a non-statutory nullification instruction. That supplemental instruction read:

 You are instructed that you shall consider any evidence which, in your opinion,
is mitigating. Mitigating evidence is evidence that reduces the Defendant's
personal or moral culpability or blameworthiness, and may include, but is not
limited to, any aspect of the Defendant's character, record, background, or
circumstances of the offense for which you have found him guilty. Our law does
not specify what may or may not be considered as mitigating evidence. Neither
does our law provide a formula for determining how much weight, if any, a
mitigating circumstance deserves. You may hear evidence which, in your
judgment, has no relationship to any of the Special Issues, but if you find such
evidence is mitigating under these instructions, you shall consider it in the
following instructions of the Court. You, and each of you, are the sole judges
of what evidence, if any, is mitigating and how much weight, if any, the
mitigating circumstances, if any, including those which have no relationship to
any of the Special Issues, deserves. 


 In answering the Special Issues submitted to you herein, if you believe that the
State has proved beyond a reasonable doubt that the answers to the Special
Issues are "Yes," and you also believe from the mitigating evidence, if any, that
the Defendant should not be sentenced to death, then you shall answer at least
one of the Special Issues "No" in order to give effect to your belief that the
death penalty should not be imposed due to the mitigating evidence presented
to you. In this regard, you are further instructed that the State of Texas must
prove beyond a reasonable doubt that the death sentence should be imposed
despite the mitigating evidence, if any, admitted before you.


 You are instructed that you may deliberate as a body about mitigating
circumstances, but you are not required to reach a unanimous verdict as to their
existence or weight. When you vote about the Special Issues, each of you must
decide for yourself whether mitigating circumstances exist and, if so, how much
weight they deserve.


These supplemental instructions explicitly told the jury that:



 It "shall" consider any and all mitigating evidence;
 The mitigating evidence might, but need not, relate to the defendant's character,
record, background, or any circumstances of the offense;
 Mitigating evidence is any evidence which reduces the defendant's personal or
moral culpability or blameworthiness;
 Mitigating evidence need not have any relationship to either of the Special
Issues;
 The jurors need not be unanimous about what specific evidence each one
considers mitigating;
 The jurors each decide what evidence is mitigating and how much weight to give
it;
 If the jury finds, from the mitigating evidence, that the defendant should not be
sentenced to death, then it "shall" answer one of the Special Issues "No"; and
 The State must prove, beyond a reasonable doubt, that the death penalty should
be imposed despite the mitigating evidence.


 

 Based upon the evidence admitted at trial and the trial judge's instructions, the jury
found that the State carried its burden on the special issues (3) and proved, beyond a reasonable
doubt, that a death sentence should be imposed despite applicant's mitigating evidence. 
Therefore, the trial judge sentenced applicant to death. 

 On direct appeal, applicant claimed that, under Penry I, Article 37.071 was
unconstitutional as applied to him because the jury was unable to give effect to his mitigating
evidence in answering the special issues. We rejected this claim and held that, regardless of
whether applicant's mitigating evidence was beyond the scope of the two statutory special
issues, the judge's extensive supplemental instruction provided a sufficient vehicle for the jury
to consider all of applicant's mitigating evidence. (4) 

 Applicant filed an original writ of habeas corpus in the convicting court in 1998, but we
dismissed that writ as untimely filed. After the Legislature revised Article 11.071, § 4A, to
permit applicant to file a new writ, he timely filed another writ and now claims that the trial
judge's supplemental "nullification" instructions were unconstitutional under Penry II. (5) 
Applicant argues that his supplemental jury instructions were "virtually identical" to those
given in Penry II, and his mitigation evidence was similar to that offered in Penry II. 
Therefore, he claims, he is entitled to relief under Penry II.

 We disagree. First, the present supplemental instructions are similar to those given in
Penry II only to the extent that both were "nullification" instructions. Otherwise, they are
dissimilar in ways that render the present instruction constitutionally sufficient. Second,
applicant's evidence of an unhappy childhood and as a slow learner is simply not the "two-edged sword" type of evidence contemplated in either Penry I or Penry II. Applicant might
be entitled to relief only if the Supreme Court intended to hold, in Penry II, that all
nullification instructions are constitutionally infirm in all cases in which the defendant offers
any mitigation evidence. We do not read Penry II that broadly, and neither did the Fifth Circuit
in its en banc decision in Robertson v. Cockrell. (6) If Robertson (whose mitigation "evidence-in quality and quantity-does not match Penry's") (7) was not entitled to relief under Penry II, then
applicant, whose mitigation evidence does not rise to the level found in Penry I, is likewise not
entitled to relief.

II.


A. Penry I mitigation evidence and the Penry II mitigation instruction issue.

 In Penry I, the Supreme Court held that, although the Texas statutory special issues are
a facially constitutional and sufficient framework, those special issues may sometimes be
insufficient to protect a defendant's right to have the jury consider and give effect to certain
types of mitigating evidence. (8) Penry's mitigation evidence was that he had suffered severe
childhood abuse and that he was mentally retarded. With evidence of this nature and severity,
the special punishment issues might be insufficient in two ways.

 First, Penry's evidence showed that, as a consequence of these two severe problems,
he had a diminished ability "to control his impulses or to evaluate the consequences of his
conduct." (9) The severity of Penry's impairment suggested a possible lack of full moral
culpability, but the Supreme Court reasoned that, without a definition of "deliberateness" in
the first special issue which would encompass a diminished moral culpability, the jury might
not believe it could give full mitigating effect to this evidence. (10) 

 Second, the type of mitigation evidence offered by Penry was a "two-edged sword";
while it diminished his personal moral culpability, it increased the likelihood that he would
constitute a continuing threat to society under the "future dangerousness" special issue. (11) 
Precisely the same evidence that made Penry potentially less morally aware and less culpable
made him considerably more dangerous to others. The Supreme Court concluded that Penry
had a constitutional right to jury instructions that would provide a vehicle for the jury to
express its "reasoned moral response" to his double-edged mitigation evidence and to decline
to impose the death penalty if it believed Penry's moral culpability was less because he had
suffered from severe childhood abuse and mental retardation. (12) Because the bare-bones jury
instructions did not provide a sufficient vehicle for the jury, the Supreme Court reversed
Penry's death sentence and remanded the case for a new punishment trial. (13)

 The 1989 decision in Penry I created grave difficulties for Texas trial courts in capital
murder cases. As the Fifth Circuit noted, trial courts:

 could not craft entirely new jury interrogatories, as the precise questions had
been written by the state legislature. Nor could they suspend the trials in
anticipation of legislative remediation, as the legislature would not meet again
until 1991 and its reaction was unknown. Hoping to provide timely and Penry-compliant trials, the courts generally chose to cure the perceived deficiencies
in the jury interrogatories by issuing, when appropriate, the supplemental
instruction described above. This the Texas courts did from the pronouncement
of Penry I to September 1, 1991, when the amended statute went into effect. (14)


 Penry himself was retried during this legislative interregnum. And the trial judge gave
the jury supplemental "nullification" instructions. (15) Once again, the Supreme Court reversed
Penry's death sentence, holding that the supplemental instructions still failed to give the jury
an adequate vehicle by which they could consider and give effect to Penry's mitigation
evidence of severe childhood abuse and mental retardation. (16) Furthermore, the Court held that
the structure of the supplemental instruction, telling the jury to change its answer to one of the
special-issue questions from a truthful "Yes" to an untruthful "No" simply to avoid imposing
the death penalty, forced conscientious jurors to violate their oath to answer the questions
truthfully. (17) Penry's death sentence was again reversed and the case returned for a third
punishment trial.

 Significantly, however, the Supreme Court did not state, in either Penry I or Penry II,
that the Texas special-issue scheme was an insufficient vehicle for all mitigation evidence, or
that all supplemental nullification instructions were necessarily unconstitutional vehicles for
a jury's consideration of mitigating evidence.

B. The two special issues provided applicant's jury with a constitutionally
sufficient vehicle to give effect to his mitigating evidence. 


 The first question before this Court is whether the two special issues given in this case
provided a sufficient vehicle for the jury to give effect to applicant's mitigating evidence of
a troubled childhood and of his somewhat limited mental ability. Given the quantity and quality
of that evidence, we conclude that they did.

 First, applicant offered evidence of his limited mental capacity. Applicant's mother
testified that applicant was "a slow learner" in school. He had an I.Q. of 78 and possible 
organic learning disabilities. Applicant attended special-education classes and his behavior was
often noted as "exemplary," but he dropped out of school in the ninth grade at the age of
eighteen. He committed this capital murder at the age of nineteen. This is evidence of below-average educational abilities and attainment, but it does not reflect even mild mental
retardation, nor does it qualify as a severe handicap. 

 Second, applicant offered evidence of his difficult family background. His father had
been in prison for robbery, was involved with a motorcycle gang, consorted with other women,
used alcohol and drugs, and stole from his own family. This situation upset applicant. Because
the family did not have a lot of money, applicant began looking for work as a young teen-ager. 
According to defense witnesses, applicant suffered because of his father's thefts from the
family and from a lack of money in the home. This evidence sets out a less-than-ideal family
background. But, like Robertson, whose natural father was an abusive alcoholic, applicant does
not-with his unfortunately not-atypical evidence of an adverse childhood-raise a Penry issue. (18) 
While it may be of some mitigating value, it is not a "severe" handicap under Penry I.

 Penry I does not require a special mitigation instruction, apart from the two statutory
special issues, for any and all mitigating evidence, regardless of its strength, quantity or
quality. For more than ten years, the Fifth Circuit has drawn the line between Penry and non-Penry mitigation evidence under the test of whether the defendant's criminal act was "due to
the uniquely severe permanent handicaps with which the defendant was burdened through no
fault of his own." (19) This test takes into account the four principles set out by the Supreme
Court in Penry: voluntariness, permanence, severity, and attribution. (20) If a disability is
acquired involuntarily, (21) is of a permanent rather than transient nature, (22) is severe in its impact
upon the person, (23) and is at least a partial cause or explanation of the criminal act, (24) then a
defendant is entitled to a vehicle by which to give effect to that evidence-either supplementary
instructions or a special mitigation issue.

 Here, applicant merely argues that he presented "significant mitigating evidence that
was virtually indistinguishable from Penry's and thus undeniably beyond the scope of the
special issues." This evidence, however, is not qualitatively or quantitatively similar to that
offered by Penry. (25) A "slow learner" is not, ipso facto, mentally retarded. A person who
attends special-education classes does not, by virtue of that fact alone, suffer a severe
disability. A person who drops out of school in the ninth grade is not necessarily the victim
of a permanent disability. Similarly, one who has a disadvantaged background or a difficult
childhood is not necessarily the victim of a severe and permanent disability. Furthermore,
applicant fails to explain how or why this evidence affected his ability to control or evaluate
his conduct. Undoubtedly, the vast majority of Americans have suffered some difficulties,
disadvantages, or dire disappointments in life. Generally, people are able to survive, surmount,
and learn from those negative experiences. 

 Moreover, applicant fails to show how being a slow learner and having been burdened
by a feckless father impacted his later behavior or criminal conduct. (26) Applicant offered no
evidence of any link or nexus between his troubled childhood or his limited mental abilities
and this capital murder. Although we need not decide whether Penry requires a defendant to
show that the crime is directly "attributable" to the severe handicap, Penry surely stands for
the proposition that there must be at least a logical, reasonable evidentiary relationship
established between the disability and the defendant's criminal conduct or his moral
blameworthiness. Applicant has failed to establish any such evidentiary link.

 Furthermore, applicant has failed to show that any mitigating quality of his family
background and mental-limitations evidence could not be fully encompassed by the two
statutory special issues. Applicant's mental limitations were surely relevant to whether he
acted deliberately in committing this robbery-murder and both his learning disability and
troubled background were relevant to whether he would constitute a future danger to society. 
In Penry, the evidence supported an inference that the defendant was unable to learn from his
mistakes as a result of his low I.Q., brain impairments, and severe childhood abuse. Thus, he
was more likely to be a future danger because of his permanent disabilities. Here, the evidence
shows the reverse: despite applicant's limitations and difficulties, his behavior in school was
often "exemplary." There is no evidence that applicant was unable to learn from experience
or unable to control his conduct, with or without his disabilities. (27) Applicant argues that:

 Evidence of Mr. Smith's troubled family life was simply beyond the scope of
the first special issue (deliberateness) to the extent that the jury believed both
that Mr. Smith acted deliberately and that his abusive background justified a
sentence less than death. The same evidence worked only to his detriment on
the second special issue (future dangerousness), because the jury could have
concluded that an individual raised in an unstable and abusive environment would
learn violence and be more likely to continue being violent as an adult. Thus, the
second special issue did not allow the jury to use Mr. Smith's family life as a
mitigating factor. Similarly, the fact that Mr. Smith is a slow learner, with a
learning disability and speech handicap, would have no bearing on the first
special issue except perhaps to hurt him and, under the circumstances, would
only contribute to a "Yes" answer under the special issue.


But this is an argument that could be made about any specific piece of evidence-youth, old age,
alcoholism, drug abuse, high intelligence, limited intelligence, poverty, disease, psychological
impairments, and so forth. Conclusory assumptions and arguments are not sufficient to make
out a Penry violation. One must first sort out the Penry "double-edged disability" mitigation
evidence which cannot be given full effect under the statutory special issues from other, non-Penry mitigation evidence which can be given full effect under the special issues. 

 Therefore, we conclude that a defendant first must make a prima facie showing of a
severe and permanent handicap, not of his own making, which is at least related to the
commission of the capital offense. (28) Second, the defendant must show that this disability
evidence was effectively beyond the reach of the two special issues. Applicant has made
neither showing. We conclude that the two special issues provided applicant's jury with a
constitutionally sufficient vehicle to give effect to his mitigating evidence.

C. The "nullification instruction" in this case was a sufficient vehicle to accord full
weight to applicant's mitigation evidence.

 

 Applicant also asserts that the extra-statutory mitigation instructions in this case were
"virtually identical" to those given in Penry II. They are not. Only if the Supreme Court
intended to say in Penry II that any and all nullification instructions are unconstitutional on
their face are these instructions infirm.

 In this case, unlike that in Penry II, the trial court's special instruction explicitly told
the jury that it "shall consider any evidence, which, in your opinion, is mitigating." (29) It defined
mitigating evidence as "evidence that reduces the defendant's personal or moral culpability or
blameworthiness." It expressly informed the jury that "[y]ou may hear evidence which, in your
judgment, has no relationship to any of the Special Issues. But if you find such evidence is
mitigating under these instructions, you shall consider it" and "you shall answer at least one
of the Special Issues 'No'" if you believe "that the death penalty should not be imposed due to
the mitigating evidence presented to you." (30) Furthermore, the trial court instructed the jury
that the State "must prove beyond a reasonable doubt that the death sentence should be imposed
despite the mitigating evidence, if any, admitted before you." 

 Thus, the present instruction not only told the jury that it "shall" consider all mitigating
evidence, even evidence unrelated to the special issues, it also told the jury how to answer the
special issues to give effect to that mitigation evidence. (31) Here, the jury did not have to read
anything into the mitigation instruction or decide which instruction should control over the
other one. (32) These instructions expressly authorized and required the jury to answer "No" to
at least one of the special issues if it believed that the death penalty was not warranted because
of the mitigating circumstances. The trial court's instructions clearly informed the jury that
mitigation evidence "trumped" the special issues. (33) 

 This supplemental instruction, although dissimilar to that in Penry II, is similar to that
in Robertson. (34) We agree with the Fifth Circuit's en banc conclusion that this supplemental
instruction provided "a more capacious vehicle than was constitutionally warranted." (35) We also
agree with that court's determination that:

 the supplemental instruction did not render the jury charge potentially
contradictory. The jury was not forced into the position-as they were in Penry
II-of falsely answering "no" to the questions of deliberateness or future
dangerousness. The most that one could say is that the supplemental instruction
was redundant in this case. (36)


Therefore, we conclude, as the Fifth Circuit did in Robertson, that the supplemental instruction
in this case was not error of any sort. (37) 

 Because we find no constitutional infirmity under either Penry I or Penry II in this
case, we agree with the trial court's recommendation that applicant's request for habeas corpus
relief be denied. We therefore deny relief.

Cochran, J.

Delivered: April 21, 2004.

Publish
1. Penry v. Lynaugh, 492 U.S. 302 (1989) (Penry I).
2. See Robertson v. Cockrell, 325 F.3d 243, 249 (5th Cir.) (en banc) (noting that "dozens" of
capital trials were conducted during this "hiatus" using an extra-statutory Penry I nullification
instruction), cert. denied, ___ U.S. ___ , 124 S.Ct. 28 (2003).
3. These special issues were:


 Do you find from the evidence beyond a reasonable doubt that the conduct of the
Defendant, LaRoyce Lathair Smith, that caused the death of the deceased was
committed deliberately and with the reasonable expectation that the death of the
deceased or another would result? 
 Do you find from the evidence beyond a reasonable doubt that there is a probability
that the Defendant, LaRoyce Lathair Smith, would commit criminal acts of violence that
would constitute a continuing threat to society?
4. Smith v. State, No. 71,333 slip op. at 10-11 (Tex. Crim. App. June 22, 1994) (not
designated for publication).
5. Penry v. Johnson, 532 U.S. 782 (2001) (Penry II).
6. Robertson, 325 F.3d at 249-58.
7. 325 F.3d at 244.
8. Penry I, 492 U.S. at 315-37, 328.
9. Id. at 322.
10. Id. at 323.
11. Id. at 324.
12. Id. at 328.
13. Id.
14. Robertson, 325 F.3d at 248-49.
15. Those instructions were:

 

 You are instructed that when you deliberate on the question posed in the special issues,
you may consider mitigating circumstances, if any, supported by the evidence presented
in both phases of the trial, whether presented by the state or the defendant. A
mitigating circumstance may include, but is not limited to, any aspect of the defendant's
character and record or circumstances of the crime which you believe could make a
death sentence inappropriate in this case. If you find that there are any mitigating
circumstances in this case, you must decide how much weight they deserve, if any, and
therefore, give effect and consideration to them in assessing the defendant's personal
culpability at the time you answer the special issue. If you determine when giving effect
to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding
to the issue under consideration, rather than a death sentence, is an appropriate
response to the personal culpability of the defendant, a negative finding should be given
to one of the special issues.

See Penry II, 532 U.S. at 790.
16. Id. at 797.
17. Id. at 798-801.
18. See Robertson, 325 F.3d at 245, 252-53.
19. Id. at 251 (quoting Graham v. Collins, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc),
aff'd, 506 U.S. 461 (1993)). The Supreme Court granted certiorari in Tennard v. Cockrell, 284
F.3d 591 (5th Cir. 2002), cert granted sub nom. Tennard v. Dretke, ___ U.S. ___ (2004) (No. 02-10038), to address whether the Court's reasoning in Penry II applies when evidence is admitted that
the defendant is mentally "slow," but the capital crime cannot be attributed to that mental slowness. 
The disposition of that case, however, is not dispositive of applicant's claim. First, we do not read
Penry II to expand upon the nature and scope of evidence that requires any additions to, or
modification of, the pre-1991 Texas special issue scheme. See Robertson, 325 F.3d at 255-57. 
Second, applicant's mitigation evidence is more akin to that in Robertson than the mentally-slow
evidence in Tennard. In other words, applicant's mitigating evidence did not show a severe handicap,
much less a "uniquely" severe one. 
20. Robertson, 325 F.3d at 251.
21. Thus, voluntary drug abuse, for example, does not qualify as constitutionally significant Penry
evidence which requires a vehicle outside the scope of the statutory special issues. See Barnard v.
Collins, 958 F.2d 634, 639 (5th Cir. 1992).
22. Youth, although it may be mitigating in a particular case, is not a permanent disability; those
who survive it will outgrow it. Thus, a jury does not normally need any additional instructional vehicle,
beyond the statutory special issues, to consider youth as a mitigating factor. See Graham, 950 F.2d at
1014.
23. For example, dyslexia and an unfortunate childhood are not so severe that they require any
additional instructional vehicle under Penry I. See Madden v. Collins, 18 F.3d 304, 308 (5th Cir.
1994); Barnard, 958 F.2d at 639. On the other hand, a defendant who suffers from chronic paranoid
schizophrenia does suffer a severe mental condition that might very well contribute to his criminal
actions. See Bigby v. Cockrell, 340 F.3d 259, 273 (5th Cir. 2003).
24. For example, childhood abuse might cause demonstrable psychological effects upon a person
and the capital offense act might be attributable to, or at least related to, those specific psychological
effects. See Madden, 18 F.3d 308. See generally, Robertson, 325 F.3d at 252-53. Compare Blue
v. Cockrell, 298 F.3d 318, 321-22 (5th Cir. 2002) (parental abandonment, physical and sexual abuse,
schizophrenia, brain injury, and resulting poor impulse control satisfied claim for specialized Penry
mitigation instruction).
25. In Penry, for example, the defendant had been diagnosed with organic brain damage,
possibly caused at birth or by beatings and multiple brain injuries at an early age. Penry offered expert
testimony that spoke of the unique character of the severe abuse he suffered, his limited cognitive
faculties, and his inability to learn from his mistakes. 492 U.S. at 309-10.
26. See Barnard, 958 F.2d at 634 (defendant's childhood experiences did not support Penry
claim in the absence of evidence that those experiences led to any mental impairment or psychological
disability linked to later criminal conduct).
27. See, e.g., Graham, 506 U.S. 461, 475-76 (1993) (jury could have concluded from
evidence of defendant's background that robbery-murder was an aberration and that he would not
pose a future danger); Davis v. Scott, 51 F.3d 457, 464 (5th Cir. 1995) (when defendant's difficult
childhood background evidence did not demonstrate that he was unable to learn from his mistakes, but
rather that he responded positively to a structured environment, second special issue provided sufficient
vehicle for jury's consideration of mitigation evidence). In Davis, as in the present case, the evidence
showed that the defendant was in special-education classes and suffered from a learning disability. 
Nonetheless, the evidence also showed that Davis was a "tender-hearted, a very kind young man
...cooperative ... very creative, very calm, anxious to please." Id. at 465. Based upon that evidence,
Davis's jury was not "compelled" to answer the second special issue affirmatively; it could give
mitigating effect to the evidence presented without any special Penry vehicle. Id. The same is true in
this case.
28. See Robertson, 325 F.3d at 251.
29. Emphasis added. Compare supra, note 15 (instructions in Penry II).
30. Emphasis added.
31. In Penry II, the Supreme Court stated that "[a] clearly drafted catchall instruction on
mitigating evidence also might have complied with Penry I." 532 U.S. at 803. Justice O'Connor then
noted with approval that the Texas Legislature had, at its earliest opportunity, enacted a statutory third
special issue which became effective September 1, 1991. That "nullification" special issue trumps the
truthful answers to the first two special issues by means of the statutorily authorized third question. At
the time of applicant's trial, however, trial courts did not have authority to create and submit this special
"nullification" mitigation issue. However, the supplemental instruction given in this case came as close
as possible to achieving the same purpose as the third special issue without the trial judge crossing the
boundary of making up new special issues without legislative authorization. 
32. Compare Penry II, 532 U.S. at 797-98 (one reading of instruction "told jurors to take
Penry's mitigating evidence into account in determining their truthful answers to each special issue.
Viewed in this light, however, the supplemental instruction placed the jury in no better position than was
the jury in Penry I").
33. The instruction did not instruct the jury to violate their oaths or answer either of the special
issues "falsely," but rather to answer the special issues honestly in light of both the question itself and
the defendant's mitigating evidence which, as the trial court clearly informed the jury, might or might not
have direct relevance to those specific issues. This wording of this specific instruction, unlike that in
Penry II, did not insert "an element of capriciousness" into the sentencing decision, "making the jurors'
power to avoid the death penalty dependent on their willingness to elevate the supplemental instruction
over the verdict form instructions." Compare Penry II, 532 U.S. at 800. Instead, the supplemental
instructions guided the jurors in answering the special issues by requiring them to consider all mitigating
evidence of whatever sort and requiring them to give effect to that evidence by truthfully answering at
least one of the special issues with a "No" if they determined that the State had failed to prove, beyond
a reasonable doubt, that a death sentence should be imposed despite the mitigating evidence. See
Penry II, 532 U.S. at 806-07 (Thomas, J., joined by Rehnquist, C.J., and Scalia, J. dissenting). We
have confidence that jurors are capable of reading and understanding these particular supplemental
instructions in a common-sense manner. This instruction is, in fact, more favorable to the defendant
than the third, statutory "nullification" special issue that Penry II noted with approval because it
explicitly put a burden on the State to prove, beyond a reasonable doubt, that the death penalty should
be imposed despite any mitigating evidence. A reasonable jury would not likely be confused by these
particular instructions.
34. Robertson, 325 F.3d at 245 n.3.
35. Id. at 258.
36. Id. Compare Bigby v. Cockrell, 340 F.3d 259, 275-77 (5th Cir. 2003) (supplemental
instruction that was "almost identical" to that in Penry II suffered same constitutional infirmity as in that
case).
37. Robertson, 325 F.3d at 258.