UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-20915
_____


ROBERT JAMES TENNARD,

                              Petitioner-Appellant,

                    versus

JANIE COCKRELL, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

                              Respondent-Appellee.

_____

     Appeal from the United States District Court for the
                Southern District of Texas
_____
                    March 1, 2002

Before SMITH, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:

     Petitioner Robert James Tennard (Tennard), convicted of
capital murder in Texas and sentenced to death, requests from this
Court a Certificate of Appealability (COA) pursuant to 28 U.S.C. §
2253(c)(2).  Tennard's sole argument is that the jury was unable to
give effect to the mitigating evidence of his mental retardation
when answering the special issue with respect to future
dangerousness at the punishment phase.  Finding that Tennard has

not made a substantial showing of the denial of a constitutional right, we DENY the COA.

I.    FACTUAL AND PROCEDURAL HISTORY

On October 17, 1985, Tennard was indicted for the capital murder of Larry Neblett (Neblett) committed during the course of a robbery.  The following evidence introduced at trial established that Tennard and two others murdered two men during a robbery.[1]

Tennard lived behind the home of the two victims, and he knew them.  The victims had invited Tennard and his two friends into their home approximately fifteen to thirty minutes before they were attacked.  Tennard stabbed one of the victims fifteen times with a knife while one of Tennard's friends killed the other victim with a hatchet.  Tennard played a dominant role in disposing of the victims' stolen property.  Tennard presented an alibi defense, and he presented other evidence from which the jury might have concluded that another person possibly could have committed the murders.  Based on the above evidence, the jury found him guilty of capital murder.

The evidence from the punishment hearing shows Tennard had been on parole from a felony rape conviction for less than four months when he committed the instant offense.  The rape victim testified Tennard and two others forced her into a car while she

---

[1] The facts are taken directly from the opinion of the Texas Court of Criminal Appeals.  *Ex parte Tennard,* 960 S.W.2d 57, 58-59 (Tex.Crim.App.  1997).

2

was at a bus stop. Just after she was forced into the car, Tennard, who was displaying about a foot-and-a-half-long pipe-wrench, threatened to kill her if she moved.

The victim testified Tennard and his friends took her to an abandoned apartment at a government project where Tennard forced her to engage in oral, vaginal and anal sex with him. After that, Tennard's two friends took turns sexually assaulting her.

Tennard and his friends then took the victim to another house where he began using drugs and discussing "pimping out" the victim. She asked Tennard if she could go to the restroom to take a bath, which he allowed her to do. She escaped through a window, and Tennard was arrested later that day. The victim testified Tennard appeared to be the leader during her ordeal. Defense counsel impeached the victim's testimony with a prior statement she made from which the jury could have inferred one of Tennard's accomplices was the leader.

Tennard's parole officer testified that a Texas Department of Correction's (TDC) record from his prior incarceration indicated he had an intelligence quotient (I.Q.) of 67. During cross-examination of this witness, the State introduced the TDC record into evidence. This document appears to have been prepared approximately five years before Tennard committed the capital murder offense, and there is a notation providing Tennard had an I.Q. of 67. However, the parole officer could not say who prepared the report or conducted the I.Q. test. This is all the

3

evidence presented at Tennard's trial with respect to his "mental retardation."[2]  The term "mental retardation" is not mentioned anywhere in this record.

Tennard also introduced evidence that he was twenty-two years of age when he committed this offense and that he had spent most of his formative years incarcerated.

At the conclusion of the punishment phase, the jury affirmatively answered the special issues.  Pursuant to Texas law, the trial court sentenced him to death.  On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence. *Tennard v. State,* 802 S.W.2d 678 (Tex.Crim.App. 1990), *cert. denied,* 501 U.S. 1259 (1991).  Tennard filed an application for state habeas relief that ultimately was denied by the Texas Court of Criminal Appeals.  *Ex parte Tennard,* 960 S.W.2d 57 (Tex.Crim.App. 1997).

_____

[2] During cross-examination, Tennard's parole officer testified as follows:

> Q. [T]his doesn't purport to be any report by any particular psychologist or anything, does it?
> A. No, sir.
> Q. It's basically just sort of, as its says, social and criminal history of [Tennard]?
> A. Right, sir.
> Q. And it says, there's basically a line for IQ, and it says 67?
> A. That's correct.
> Q. And it has no indication of who may have given those tests or under what conditions?
> A. No sir, it doesn't.

4

Subsequently, Tennard filed the instant federal habeas petition in district court. The district court denied Tennard's petition and his request for a COA. Tennard now requests a COA from this Court.

II.   ANALYSIS

A.   STANDARDS OF REVIEW

Tennard filed his section 2254 application for habeas relief on December 18, 1998, which was after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). His application is therefore subject to the AEDPA. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997). Under the AEDPA, a petitioner must obtain a COA. 28 U.S.C. § 2253(c)(2). A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S.Ct. 3383, 3394 n.4 (1983) (citation and internal quotation marks omitted). Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997).

To determine whether a COA should be granted, we must be mindful of the deferential scheme set forth in the AEDPA. *Hill v. Johnson,* 210 F.3d 481, 484-85 (5th Cir. 2000). Pursuant to 28 U.S.C. § 2254(d), we defer to a state court's adjudication of petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1519-20 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is objectively unreasonable. *Id.* at 1521.

Further, state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. Section 2254(e)(1).

B.   JURY INSTRUCTIONS

Relying on *Penry v.Lynaugh*,[3] Tennard argues that the special issues submitted at the punishment phase did not provide the jury with a vehicle for giving mitigating effect to his evidence of mental retardation. Specifically, Tennard contends that a juror answering the two special issues affirmatively but nevertheless believing a life sentence appropriate (based on the evidence of his mental retardation) had no vehicle to express this belief.

In reviewing a *Penry* claim, we must determine whether the mitigating evidence introduced at trial was constitutionally relevant and beyond the effective reach of the jury. *Davis v. Scott,* 51 F.3d 457, 460 (5th Cir. 1995). To be constitutionally relevant, "the evidence must show (1) a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own, . . . and (2) that the criminal act was attributable to this severe permanent condition." *Id.* at 460-61 (internal quotation marks and citation omitted).

As previously set forth, during the punishment phase, Tennard called his parole officer, William Kinard (Kinard), as a witness. Kinard testified that an I.Q. test was administered to inmates at TDC as a matter of course. Kinard also testified that a document from TDC provided Tennard's I.Q. was 67. Kinard was the only defense witness

---

[3] 492 U.S. 302, 109 S.Ct. 2934 (1989).

who testified before the jury during the punishment phase.[4]

During defense counsel's closing argument, he referred to Tennard's "low" I.Q. several times:

> Then I called a witness who testified he's Tennard's parole officer. Uncontroverted evidence that when Robert Tennard was examined, when he got out of the penitentiary, by the officials who determined how to classify him, how to treat him, the same information that was communicated to his parole officer, what to do for him, how to help him when he's out on parole. Information that the prison psychiatrist had, the information that they gave is that Tennard has got a 67 IQ. The same guy that told this poor unfortunate woman [the rape victim] that was trying to work that day, "Well, if I let you in there, will you leave?" And he believed her. This guy with the 67 IQ, and she goes in and, sure enough, she escapes, just like she should have. That is uncontroverted testimony before you, that we have got a man before us that has got *an intelligence quotient . . . that is that low.*

> \*     \*     \*

> Now you're charged with acting as Robert Tennard's peers. You have to judge him as his peers. That's going to be hard for you to do. None of you grew up where he grew up. Only one of you is black and none of you are suffering from a 67 IQ. So you're going to have to try to judge this man and decide what his punishment would be as his peers. And I would ask you as you do that, as is your responsibility, you take into consideration the things that you have been informed of by me and by things the prosecutor has told you in judging Robert Tennard . . . .

> \*     \*     \*

> And don't let [the prosecutor] get up here and tell you to put blinders on and just answer the questions in a vacuum. The law allows you to take all the things into consideration that I talked to you about -- attitude toward the death penalty, take all these things into consideration, the 67 IQ -- in deciding how you answer the those questions. You have a right to do that under Texas law. Don't let [the

---

[4] The record shows that the trial court did not allow defense counsel to call a witness who would have testified that one of Tennard's accomplices received a life sentence for the instant offense.

prosecutor] tell you you can't just look at the evidence and just answer the questions. You are allowed more latitude than that. Remember, what you do here will be forever lasting one way or the other. . . .

(emphasis added).

As the record reveals, although defense counsel presented evidence of Tennard's low I.Q., he did not argue that Tennard was mentally retarded. The Court of Criminal Appeals recognized that the term "mental retardation" was never mentioned in the trial record. *Ex parte Tennard,* 960 S.W.2d at 59. Indeed, a majority of the Court of Criminal Appeals found "no evidence in this record that [Tennard] is mentally retarded." *Id.* at 61.[5] Under the AEDPA, we are required to afford a presumption of correctness to this factual finding. 28 U.S.C. § 2254(e)(1); *see Davis,* 51 F.3d at 461 n.4 (affording a presumption of correctness to state court's finding of no evidence that petitioner was mentally retarded).

This Court has explained that evidence of a low I.Q. does not constitute a uniquely severe condition or is within the jury's effective reach pursuant to the teachings of *Penry. Andrews v. Collins,* 21 F.3d 612, 629-30 (5th Cir. 1994); *Lackey v. Scott,* 28 F.3d 486, 489-90 (5th Cir. 1994).

Nevertheless, Tennard contends that an individual with an I.Q. of

---

[5] Additionally, in a concurring opinion, Judges Meyers and Price concluded that there was not enough evidence of mental retardation in the record to support Tennard's claim. 960 S.W.2d at 67 n.9. Judge Baird dissented, opining that Tennard's I.Q. of 67 was "presumptive of his mental retardation." *Id.* at 71.

67 has significantly below normal functioning and is presumptively mentally retarded. Thus, he argues, such an individual is less able than a normal adult to control his conduct, evaluate the consequences of his conduct, and learn from his mistakes. To support this proposition, Tennard points out that the American Association of Mental Retardation (AAMR) classified individuals with an I.Q. score of 75 and below as presumptively retarded. *See* AAMR Mental Retardation: Definition, Classification, and Systems of Supports 14 (9th ed. 1992).

The flaw in Tennard's argument is that he did not establish or argue to the jury that he was mentally retarded. A prison document provided that Tennard had an I.Q. score of 67. There was no evidence introduced with respect to the meaning of the score, nor its relation to Tennard's moral culpability. As stated, the term "mental retardation" was never articulated before the jury. This dearth of evidence is in stark contrast to the "substantial mitigating evidence that Penry was mentally retarded." *Penry v. Johnson,* 261 F.3d 541 (5th Cir. 2001). Under these circumstances, we are constrained to hold that Tennard has not rebutted the presumption of correctness afforded the state court's finding that there was "no evidence" of Tennard's mental retardation.

Even assuming *arguendo* for purposes of this appeal that Tennard has rebutted with clear and convincing evidence the state court's finding of no evidence of mental retardation, his claim must fail because he

made no showing at trial that the criminal act was attributable to this severe permanent condition.

We have recognized it is not simply the fact that one is labeled mentally retarded that establishes a *Penry* claim. *See Robison v. Johnson,* 151 F.3d 256, 264 (5th Cir. 1998) (citing *Robison v. Texas,* 888 S.W.2d 473 (Tex.Crim.App. 1994)).[6] A petitioner must show there is a nexus between the severe permanent condition (here, alleged mental retardation) and the capital murder. As in Tennard's case, in *Boyd v. Johnson,* the only evidence of mental retardation introduced at trial was the petitioner's I.Q. score of 67 contained in his prison packet. 167 F.3d 907, 912 (5th Cir. 1999). We stated that even assuming that the I.Q. score of 67 demonstrates a "`uniquely severe permanent handicap,' it does not establish `that the criminal act was attributable to this severe permanent condition.'" *Id.* (quoting *Davis,* 51 F.3d at 461). Moreover, we expressly have rejected the notion that "a nexus is inherent between any evidence of mental retardation and a crime." *Harris v. Johnson,* 81 F.3d 535, 539 n.11 (5th Cir. 1996).

Tennard is precluded from establishing a *Penry* claim because he failed to introduce at trial any evidence indicating that the capital murder was in any way attributable to his I.Q. of 67. *See Crank v. Collins*, 19 F.3d 172, 175-76 (5th Cir. 1994) (stating that it is well

---

[6] *See also Davis,* 51 F.3d at 460 (explaining that "evidence of a disadvantaged background, or emotional and mental problems, does not raise, *ipso facto*, a *Penry* claim").

established capital defendants cannot base a *Penry* claim upon evidence that could have been, but was not, proffered at trial).

For the above reasons, we conclude that Tennard has not made a substantial showing of the denial of a constitutional right and DENY his request for a COA.

DENIED.

ENDRECORD

DENNIS, Circuit Judge, Dissenting:

I respectfully dissent.

The threshold question under AEDPA is whether Tennard seeks to apply a rule of law that was clearly established at the time his state-court conviction became final. Williams v. Taylor, 529 U.S. 362, 390 (2000). That question is easily answered because the merits of his claim are squarely governed by Penry v. Lynaugh, 492 U.S. 302 (1989)(Penry I).[7] Because Penry I qualifies as "clearly established Federal law, as determined by the Supreme Court," that precedent "dictated" that the Texas Court of Criminal Appeals apply that decision in entertaining Tennard's Penry claim. See Williams, 529 U.S. at 390 (citing Teague v. Lane, 489 U.S. 288, 301 (1984)).

Tennard is entitled to relief because the Texas Court of Criminal Appeals's adjudication rejecting his Penry I claim resulted in a decision that was (1) "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," and (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2) (West Supp. 2001).

At the penalty phase of the trial, Tennard introduced evidence "on his 'mental retardation.'" Ex parte Tennard, 960 S.W.2d 57, 59 (Tex. Crim. App. 1997)) (en banc). The evidence of Tennard's mental retardation consisted of evidence that he had an I.Q. of 67, that he was a "follower" of others, and that he was easily duped.[8] Id. at 58-59. Nevertheless, the state court of criminal appeals rejected Tennard's Penry I claim on two grounds. First, that court found that there was

---

[7] Tennard's direct state appeal was decided November 28, 1990, and his motion for rehearing was overruled January 30, 1991. Tennard v. State, 802 S.W.2d 678 (Tex. Crim. App. 1991).

[8] In a previous offense, Tennard was easily fooled into allowing a victim to go to the restroom and escape because he believed her promise not to run away. Ex parte Tennard, 960 S.W.2d at 58-59.

"no evidence in the record that applicant is mentally retarded." Id. at 61. Second, even assuming that the evidence of Tennard's I.Q. of 67 and other evidence was evidence of mental retardation, the court of criminal appeals rejected his Penry I claim because (1) there was no evidence Tennard's low I.Q. rendered him unable to appreciate the wrongfulness of his conduct or to learn from his mistakes or diminished his ability to control his impulses or evaluate the consequences of his conduct; (2) therefore, there was no danger that the jury would have given any mitigating qualities of the evidence of Tennard's low I.Q. only aggravating effect in answering special issue two (whether there was a probability that he would be a continuing threat to society); and (3) the special issues did not place mitigating qualities of the evidence of applicant's low I.Q. beyond the effective reach of the jury: "[t]he jury could have used this evidence for a 'no' answer to the first special issue on 'deliberateness,'" and "the jury could have used the low I.Q. evidence to conclude [that Tennard] was a 'follower' instead of a 'leader.'" Id. at 62-63. Thus, "[t]here was ample room within special issue two for the jury to give effect to any mitigating qualities of applicant's low I.Q. evidence." Id.

1.

The finding of fact of the Texas Court of Criminal Appeals that there was no evidence in the record that Tennard is mentally retarded was patently an "unreasonable [factual] determination." "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Fed. R. Evid. 401. The evidence in the record of Tennard's child-like credulity and I.Q. of 67 had a tendency to make the existence of his mental retardation more probable that it would be without that evidence.[9] In a capital murder

---

[9] Findings of fact by panels of this court in other cases are not binding upon this panel under the doctrine of stare decisis. See, e.g., 18 James Wm. Moore et al., Moore's Federal Practice § 134.05[3]

14

case the fact that mental retardation is part of the defendant's character and background is relevant mitigating evidence that the jury must be allowed to consider and to give effect to in deciding whether to inflict the death penalty. Penry I, 492 U.S. at 316-22, 327-28 (citing Woodson v. North Carolina, 428 U.S. 280 (1976); Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982); McCleskey v. Kemp, 481 U.S. 279, 304 (1987)). Therefore, the defendant's mental retardation is a fact of consequence to the determination of the death penalty action and any evidence that makes its existence more probable is relevant mitigating evidence of that mental condition. Because there plainly is evidence in the record of mental retardation in Tennard's character and background, the court of criminal appeals's unreasonable finding to the contrary in adjudication of Tennard's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Consequently, under § 2254(d)(2), Tennard's application for a COA to pursue a writ of habeas corpus should be granted.

2.

In Penry I, the Supreme Court held that (1) "at the time Penry's conviction became final, it was clear from Lockett and Eddings that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty[,]" 492 U.S. at 318; (2) "[t]he rule Penry [sought]--that when such mitigating evidence [of his mental retardation and abused childhood] is presented, Texas juries must . . . be given jury instructions that make it possible for them to give effect to that

_____

(3d ed. 1999) ("The doctrine of stare decisis does not apply to the determination of the facts of a case.").

15

mitigating evidence in determining whether the death penalty should be imposed--is not a 'new rule' under Teague because it is dictated by Eddings and Lockett[,]" id. at 318-19; (3) "it is not enough simply to allow the defendant to present mitigating evidence to the sentencer[-][t]he sentencer must also be able to consider and give effect to that evidence in imposing sentence[,]" id.; (4) "[i]n order to ensure reliability in the determination that death is the appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime[,]" id. at 328; and (5) therefore, "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused [childhood] background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision." Id. at 328 (internal quotations and citations omitted).

Thus, the Supreme Court in Penry I agreed with Penry's argument "that his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its reasoned moral response to that evidence in determining whether death was the appropriate punishment." Id. at 322. The Court explained in detail why it rejected the State's contrary argument that the jury was able to consider and give effect to all of Penry's mitigating evidence in answering the three special issues. Id.

The first special issue, which asked whether the defendant acted "deliberately and with the reasonable expectation that the death of the deceased . . . would result," impermissibly limited the jury's function because the term "deliberately" had not been defined by the Texas Legislature, the Texas Court of Criminal Appeals, or the trial court's instructions. Id. at 322. Assuming that the jurors "understood

16

'deliberately' to mean something more than . . . 'intentionally' committing murder, those jurors may still have been unable to give effect to Penry's mitigating evidence in answering the first special issue." Id. The Court concluded that the jury could not give full effect to Penry's evidence under the first special issue because "deliberately" was not defined "in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability." Id. at 323. Thus, Penry's "mitigating evidence of mental retardation and childhood abuse ha[d] relevance to his moral culpability beyond the scope of the special issues. . . ." Id. at 322. Consequently, the Court concluded, unless there are "jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue." Id. at 323. "Thus, we cannot be sure that the jury's answer to the first special issue reflected a reasoned moral response to Penry's mitigating evidence." Id. (internal quotation omitted).

The second special issue, which asked "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," permitted the jury to consider and give effect to Penry's mental retardation and childhood abuse as "relevant only as an aggravating factor. . . ." Id. But the second special issue was not inadequate simply because it only gave effect to Penry's evidence as an aggravating factor; it was dysfunctional for the independent reason that it did not allow the jury to give "full consideration [to the] evidence that mitigates against the death penalty." Id. at 328. "The second special issue, therefore, did not provide a vehicle for the jury to give mitigative effect to Penry's evidence of mental retardation and childhood abuse." Id. at 324.

As the justices who dissented in part in Penry acknowledged, the

17

<u>Penry</u> majority held "that the constitutionality [of a death sentence under the Texas special issues] turns on whether the questions allow mitigating factors not only to be considered (and, of course, given effect in answering the questions), but also to be given effect in all possible ways, including ways that the questions do not permit." <u>Id.</u> at 355 (Scalia, J., dissenting in part and concurring in part). Or, as the majority concluded, "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentence." <u>Id.</u> at 328.

The Court in <u>Penry I</u> expressly rejected the State's argument that any defect in the jury instructions should be disregarded because Penry's defense counsel was able to argue that jurors who believed that Penry, because of his mitigating evidence of mental retardation and childhood abuse, did not deserve a death sentence should vote "no" on one of the special issues regardless of the State's proof on that the answer. <u>Id.</u> at 325. The Court pointed out that "the prosecution countered by stressing that the jurors had taken an oath to follow the law, and that they must follow the instruction they were given in answering the special issues." <u>Id.</u> "In light of the prosecutor's argument, and in the absence of appropriate jury instructions," the Court concluded, "a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." <u>Id.</u> at 326.

Further, the Court reaffirmed and quoted its opinion in <u>McCleskey v. Kemp</u>: "'In contrast to the carefully defined standards that must narrow a sentencer's discretion to impose the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.'" <u>Id.</u> at 327 (quoting 481 U.S. 279, 304 (1987)).

18

Consequently, the Court concluded:

> Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. . . . In order to ensure reliability in the determination that death is the appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime.

Id. at 327-28 (internal citations and quotations omitted).

Tennard is entitled to relief under 28 U.S.C. § 2254(d)(1) because the decision of the Texas Court of Criminal Appeals rejecting his Penry I claim is based on rationales that were rejected generally and specifically by Penry I. In general, the Supreme Court in Penry I agreed with Penry's argument "that his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment [and] reject[ed] the State's contrary argument that the jury was able to consider and give effect to all of Penry's mitigating evidence in answering the special issues without any jury instructions on mitigating evidence." Penry I, 492 U.S. at 322. The decision of the Texas Court of Criminal Appeals contradicted that basic Penry I holding by deciding that the special issues allowed the jury to consider and give effect to Tennard's mitigating evidence of mental retardation.

Moreover, the decision of the Texas Court of Criminal Appeals was contrary to Penry I in at least three specific ways. First, in contradiction of Penry I, the Texas Court of Criminal Appeals held that, in order have his mitigating evidence of mental retardation considered

19

and given effect by the jury, Tennard must introduce additional evidence that his low I.Q. rendered him unable to appreciate the wrongfulness of his conduct or to learn from his mistakes or diminished his ability to control his impulses or evaluate the consequences of his conduct. The state-court's reading of that additional requirement into Penry I is based on a misinterpretation of dicta[10] in Penry I and is contrary to Penry I's holding.[11] As Penry I repeatedly made clear, when a state's capital punishment scheme assigns a jury the role of sentencer, any and all mitigating evidence, including evidence of the defendant's mental retardation, must be presented to the jury, id. at 328; and it is exclusively the prerogative of the jury to consider, weigh, and decide what effect should be given to that evidence in its determination of whether to inflict the death penalty. See id. at 323, 328.

Second, the Texas Court of Criminal Appeals also held, contrary to Penry I, that the Supreme Court's decision does not apply under special issue two in the absence of evidence tending to cause the jury to give

_____

[10] The statutory phrase "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. See also infra note 7 and accompanying text.

[11] In Penry I, the Court observed in passing that "[i]f the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse.'" Penry I, 492 U.S. at 319 (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). This is merely a statement of the underlying moral and social principles requiring that a potential death sentencer must consider and give effect to evidence of the defendant's mitigating evidence. This passage cannot be read with any intellectual honesty as being part of or essential to the Penry I holding or a finding or judicial notice of an adjudicative fact in Penry I. See Fed. R. Evid. 201.

20

only aggravating effect to the evidence of defendant's low I.Q., Tennard, 960 S.W.2d at 62; and that "[t]here was ample room within special issue two for the jury to give effect to any mitigating qualities of applicant's low IQ evidence," such as the evidence in the present case and in defendant's prior felony rape conviction that he was a "follower" instead of a "leader" in the commission of both crimes with others. Id. at 62-63. However, the Supreme Court in Penry I plainly held that the second special issue was not inadequate simply because it only gave effect to Penry's evidence as an aggravating factor; it was dysfunctional independently because it did not allow the jury to give full effect to Penry's mitigating evidence. Penry I, 429 U.S. at 323.

Third, the state court of criminal appeals held, contrary to Penry I, that the special issues did not place mitigating qualities of the evidence of Tennard's low I.Q. beyond the effective reach of the jury because "[t]he jury could have used this evidence for a 'no' answer to the first special issue on 'deliberateness.'" Tennard, 960 S.W.2d at 62. The Supreme Court in Penry I specifically rejected the very same rationale or argument: "Penry's mental retardation was relevant to the question whether he was capable of acting 'deliberately,' but it also had relevance to [his] moral culpability beyond the scope of the special verdict questio[n]." Penry I, 529 U.S. at 322 (citing Franklin v. Lynaugh, 487 U.S. 164, 185 (1988)) (alteration in original).

Finally, in the concluding paragraph of Section III of Penry I, the Supreme Court again expressly rejected all three of the rationales set forth by the Texas Court of Criminal Appeals in the present case for denying Tennard a writ of habeas corpus:

> In this case, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision. Our reasoning in Lockett and Eddings thus compels a remand for resentencing so that we do not risk that the death penalty will be imposed in spite of factors

21

> which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

Id. at 328 (internal quotations and citations omitted). In short, the state-court decision in the present case contradicts the holding set forth in Penry I because each ruling or rationale set forth in Tennard was rejected repeatedly by Penry I as not being a constitutionally sound basis for upholding a death penalty under the Texas special issues scheme because that scheme inherently prevents the sentencing jury from fully considering and giving effect to mitigating evidence of mental retardation in determining whether to inflict the death penalty.

3.

The flawed majority opinion reaches an incorrect result because it ignores the authoritative interpretation of 28 U.S.C. § 2254(d) set forth by the Supreme Court in Williams for deciding whether the adjudication of Tennard's Penry I claim by the Texas Court of Criminal Appeals resulted in a decision that was contrary to clearly established Federal law, as determined by the Supreme Court.

Instead of following the teachings of Williams, as set forth and applied in the foregoing sections of this dissent, the majority relies upon and applies prior decisions of this circuit which were based on the dicta, as opposed to the holding, of Penry I. The majority concludes that a petitioner, such as Tennard, who makes a Penry I claim, "must show there is a nexus between the severe permanent condition (here, alleged mental retardation) and the capital murder." Maj. Op. at 10-11 (citing Boyd v. Johnson, 167 F.3d 907, 912 (5th Cir. 1999); Harris v. Johnson, 81 F.3d 535, 539, n.11 (5th Cir. 1996); Davis v. Scott, 51 F.3d 457, 461 (5th Cir. 1995)). The cases upon which the majority relies for this nexus rule, and their source, Madden v. Collins, 18 F.3d 304, 307 (5th Cir. 1994), are based upon the dicta, rather than the holding, of

22

Penry I.[12]

The Supreme Court in Penry I concluded that the rule sought by Penry – "that when mitigating evidence of mental retardation or abused childhood is presented, Texas juries must, upon request, be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be imposed" -- was not a "new rule" under Teague because it was dictated by Eddings and Lockett. Penry I, 492 U.S. at 318-19. The Court went on to explain the moral and social principles underlying those decisions as follows:

> Underlying Lockett and Eddings is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. Moreover, Eddings, makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. Only then can we be sure that the sentencer has treated the defendant as a uniquely individual human bein[g] and has made a reliable determination that death is the appropriate sentence. Thus, the sentence imposed at the penalty stage would reflect a reasoned *moral* response to the defendant's background, character, and crime.'

Penry I, 492 U.S. at 319 (internal quotations and citations omitted) (alterations and emphasis in original). Although this passage is enlightening and invaluable to a deeper understanding of the jurisprudence, it is clearly dicta and not part of the holding of Penry I, which consisted principally of the rule sought by Penry that the

---

[12] The Texas Court of Criminal Appeals relied upon the same dicta for a somewhat similar nexus rule. See discussion supra p.2.

Court found had already been announced by <u>Eddings</u> and <u>Lockett</u>. The Court's explanation of the underlying ethos of prior decisions was dicta and not the holding of <u>Penry I</u>.

Assuming that the nexus rule was a proper circuit court embroidery based upon the dicta of <u>Penry I</u> and therefore was at one time a binding rule in this circuit, it cannot serve as a precedent in the present case. The Supreme Court made it clear in <u>Williams</u> that the statutory phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," in 28 U.S.C. § 2254(1), "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412 ("[A]s the statutory language makes clear . . . §2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence.").[13] Consequently, <u>Williams</u> dictates that we determine whether a state-court habeas corpus adjudication resulted in a decision that was contrary to clearly established Federal law by applying the holdings of the Supreme Court decisions, rather than Supreme Court dicta or our own decisions based on such dicta. Because the nexus rule applied by the majority is based on the dicta of <u>Penry I</u>, rather than its holding or the holdings of <u>Eddings</u> and <u>Lockett</u>, which <u>Penry I</u> applied, it should not be applied in the present case.

---

[13] <u>See also</u> <u>Williams</u>, 529 U.S. at 389-90 & n.15 (Stevens, J., concurring, joined by Justices Souter, Ginsburg, and Breyer)("Otherwise the federal law determined by the Supreme Court of the United States might be applied by the federal courts one way in Virginia and another way in California. In light of the well-recognized interest in ensuring that federal courts interpret federal law in a uniform way, we are convinced that Congress did not intend the statute to produce such a result. . . . Indeed, a contrary rule would be in substantial tension with the interest in uniformity served by Congress' modification in AEDPA of our previous <u>Teague</u> jurisprudence -- now the law on habeas review must be 'clearly established' by this Court alone. . . . It would thus seem somewhat perverse to ascribe to Congress the entirely inconsistent policy of perpetuating disparate readings of our decisions under the guise of deference to anything within a conceivable spectrum of reasonableness.")(citations omitted).

24

For the foregoing reasons the decision of the Texas Court of Criminal Appeals was contrary to the clearly established holding of Penry I, and Tennard should be granted a COA to pursue habeas relief.