United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 29, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-10352
_____

PABLO MELENDEZ, JR.,

Petitioner - Appellant,

versus

DOUG DRETKE, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
District Cause No. 00-CV-190
_____

Before HIGGINBOTHAM, DAVIS and PRADO, Circuit Judges.[1]

PRADO, Circuit Judge.

Pablo Melendez, Jr., was convicted of capital murder and sentenced to death. Melendez seeks a Certificate of Appealability (COA) to appeal the district court's denial of federal habeas relief based on one claim. After considering that request, this Court denies a COA.

------

[1]Pursuant to 5th Cir. R. 47.5, this Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1

## Background of the Request for COA

A Texas jury convicted Melendez of capital murder and assessed a death sentence. The Texas Court of Criminal Appeals affirmed the conviction and sentence, and the United States Supreme Court denied Melendez's petition for writ of certiorari. Subsequently, the Court of Criminal Appeals denied Melendez's state habeas corpus petition.

Melendez applied for federal habeas relief on November 9, 2000, and amended his petition on December 22, 2000. The district court entered a final judgment denying relief on March 14, 2003, and later denied Melendez's request for a COA. Melendez then filed a notice of appeal and asked this Court for a COA.

## Background of Melendez's Offense

The Court of Criminal Appeals summarized the relevant facts of the underlying crime in its opinion on direct appeal:

> At the guilt/innocence stage of trial, the State presented fifteen witnesses, including testimony from the surviving victim, to establish the circumstances surrounding the robbery/murder of which [Melendez] was convicted. Their testimony, if believed, established the following. On the evening of September 1, 1994, [Melendez], who was eighteen years old, visited and drank beer with a group of friends in the driveway of a Fort Worth residence. At approximately 11:30 p.m., [Melendez] stated, in a voice loud enough for most to hear, his intention to rob "some mother fucker," and he walked away alone.
> At that same time, in the nearby parking lot of a self-service car wash, the two victims in this case had parked their pick-up truck parallel to a walk-up pay phone. They had been there a number of minutes when

2

one of them, Tommie Joe Seagraves, noticed [Melendez] walking up behind the truck. As Seagraves looked on, he warned the truck's driver, Michael Sanders, of [Melendez's] approach. [Melendez] positioned himself about fifteen feet from the driver's side door. Without any warning or even a word being spoken, [Melendez] turned and fired one shot into the cab of the vehicle, and it struck Seagraves in the neck. [Melendez] then announced his first demand that Sanders hand over all the money in the truck. As Sanders pleaded with [Melendez] not to shoot him, he was ordered from the vehicle, and then forced to walk toward [Melendez] and hand over the money. Relieved of his money, Sanders turned and started back toward the truck where Seagraves still sat wounded and unable to move. Before he reached the vehicle, [Melendez] fired again and struck Sanders in the back. In rapid succession, [Melendez] fired three more shots and all struck Sanders in either the back or the arm. Sanders finally toppled forward through the open driver's side door and came to rest in the floorboard of the truck with his head resting against Seagraves' leg. As Sanders lay dying, [Melendez] approached, reached through the cab with the gun in his hand, placed the muzzle next to Seagraves' forehead, and pulled the trigger. Nothing happened. The gun was empty, so [Melendez] simply turned and walked back in the direction he had come. In the end, Seagraves received two bullet wounds; the initial wound when [Melendez] first approached and a second wound received from a bullet that had passed through the decedent and struck Seagraves' arm. Sanders was shot four times and died within minutes.

*Melendez v. Tex.*, No. 72,420 slip opinion at 2-3 (Tex. Crim. App. Oct. 7, 1998) (not designated for publication).

Shortly after Melendez's trial, Sanders's mother, Gracie Jett, provided Melendez's attorneys with information that a man named Jeffrey Jackson had come upon the murder scene, saw a truck with a woman passenger parked nearby, and saw two Hispanic males going through the pockets of one of the victims. According to

3

Melendez, Jett relayed this information to Diane Tefft, the Fort Worth police detective that was handling the case. Tefft purportedly told Jett not to get involved in the investigation and Tefft failed to follow up on the information Jett provided. Upon learning of this information, Melendez's attorneys interviewed Jackson. Jackson confirmed Jett's rendition, although Jackson's version of the events changed somewhat with subsequent interviews. Jackson apparently expressed his willingness to appear in court and testify about what he witnessed, but failed to appear when served with a subpoena for Melendez's motion for new trial. This purported new evidence serves as the basis for Melendez's request for a COA.

## Standard of Review

To obtain a COA, Melendez must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El*, 123 S. Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make this showing, Melendez must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 123 S. Ct. at 1039 (quoting *Slack*, 529 U.S. at 484). Because the district court denied relief on the merits, rather than on procedural grounds, Melendez "must demonstrate that reasonable

4

jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484.

In determining whether to grant a COA, this Court's examination is limited "to a threshold inquiry into the underlying merit of [Melendez's] claim[]." *Miller-El*, 123 S. Ct. at 1034. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id*. at 1039. Instead, this Court's determination is based on "an overview of the claims in the habeas petition and a general assessment of their merits." *Id*. "Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination." *Tennard v. Cockrell*, 284 F.3d 591, 594 (5th Cir. 2002).

## Melendez's Brady Claim

Melendez's claim in support of his request for a COA is a purported *Brady* violation. Melendez claims his due process rights were violated because the State of Texas (the State) failed to disclose material exculpatory evidence; specifically, that the State failed to tell him that Jackson came upon the crime scene and observed someone going through the pockets of one the victims. Although Melendez does not argue that the particular evidence would have made a difference in his case, he

5

maintains the evidence is material and admissible.  Melendez complains that by failing to conduct an evidentiary hearing, the state courts denied him the opportunity to develop his *Brady* claim and foreclosed his ability to show he is entitled to habeas relief.

In *Brady v. Maryland*, the United States Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Md.*, 373 U.S. 83, 87 (1963).  To establish a *Brady* violation, a petitioner must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the petitioner, (3) the evidence was material either to guilt or punishment, and (4) nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence. *See Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997).

In assessing the materiality of undisclosed evidence, the "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *U.S. v. Bagley,* 473 U.S. 667, 682 (1985).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*. at 682.  A "reasonable probability" of a different result is

shown when the non-disclosure "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995).

In the instant case, the state habeas court[2] first concluded that Melendez failed to establish that the purported *Brady* evidence was withheld. Although Jett testified during the hearing on Melendez's motion for new trial that she told Tefft about Jackson's observation, the trial judge determined that Jett was not a credible witness. The district court correctly deferred to that finding. *See* 28 U.S.C. § 2254(e)(1) (determination of state court's factual finding is presumed correct unless applicant rebuts finding with clear and convincing evidence). Because Melendez did not rebut the state court's finding with evidence to the contrary, the district court correctly determined that adequate factual support exists to support the state judge's conclusion that Melendez did not prove the State withheld the disputed evidence.

The state court also determined that the evidence was not material. The district agreed and determined that even if the state trial judge were wrong about whether the State withheld evidence, the evidence is not material. The record supports that conclusion.

---

[2]Notably, the state habeas judge was also the trial judge.

7

Jett testified to the most favorable version of the disputed evidence. During the hearing on Melendez's motion for new trial, Jett explained that she spoke with several people who were located near the scene of her son's death in an effort to solve her son's murder. Jett stated Jackson owned a barbeque restaurant a block from the car wash where her son was killed and that she spoke with Jackson over the telephone after her son's death. Jett explained that Jackson told her that he had heard several gunshots around 11:30 on the evening of her son's death and heard someone scream, "the MFs are shooting at me." According to Jett, Jackson and his girlfriend then drove to the carwash, saw a white truck parked by the telephone, saw a black truck park along the street with a woman inside the truck, and observed two Hispanic males in the parking lot going through the pockets of a man in the white truck. Jett further testified that Jackson stated that he asked the men if they needed any help and that the men told him everything was under control. Jett explained that Jackson then left the scene and agreed to relay his observations to the police.

Jett also testified that she advised Tefft about what Jackson had observed and that Tefft told her not to get involved in the investigation. Jett also stated that she gave the information to the lead prosecutor in the case and that the prosecutor had told her that Melendez had not killed her son. Jett explained that she did not tell Melendez's attorney about

8

this information because she did not become convinced that Melendez was not the killer until after the trial. Notably, this information, if true, is consistent with the evidence presented during trial and during the hearing on the motion for new trial.

Both of the prosecutors for Melendez's trial stated in affidavits that there was evidence of another truck at the scene of the murder shortly after the shooting and that the defense was aware of that information. To support these assertions, the State submitted Seagraves's written statement in which Seagraves states that a Mexican man and a younger boy stopped behind the truck after the shooting and asked him what was wrong. This statement was admitted at trial. The State also submitted a written statement by Susie Carillo who stated that after hearing shots, she saw a man run up the street. Carillo explained that she went outside and heard a man crying "please help me." According to Carillo, she called 911, walked down to the car wash, observed a group of men in a pickup truck stopped at the scene, and saw one of the men trying to help the men in the truck. Although her trial testimony was somewhat disorganized, the written statement summarizes Carillo's trial testimony. Thus, Jett's version of what Jackson observed is consistent with Seagraves's statement about what happened after the shooting and Carillo's version of the events. Moreover, substantially the same information was presented to the jury.

During trial, a paramedic and a police officer who responded

9

to the car wash testified that Sanders's pockets were turned inside out. The paramedic also testified that several people at the car wash waved the ambulance down as it arrived. In addition, a police detective who responded to the murder scene testified he spoke to a Hispanic male at the scene of the murder. Additionally, a photo exhibit reflected that Sanders's pants pockets were pulled out. Thus, the jury knew that someone arrived at the car wash after the shooting and that Sanders's pockets were altered. Even with this information, the jury found Melendez guilty.

The district court accurately assessed the implications of the information Jackson may have provided:

> The information Jackson provided may have helped to explain why the pockets were turned out, but it would not have cast doubt on Melendez's guilt. . . . [A]s the record makes clear, Jackson's hearing gunshots and someone yelling and then witnessing a dark pickup truck and two Hispanic men at the scene, one looking through the pockets of the murder victim, is not contrary to Melendez's conviction. Instead, since everything Jackson witnessed at the scene was after the shooting, it is consistent with testimony given by other witnesses at trial and statements made by other persons at the scene.

The district court correctly concluded that Melendez's *Brady* claim lacked merit because the events Melendez contends Jackson observed occurred after the shooting. Even if Jackson's observations were disclosed to the defense, there is no reasonable probability the result of the proceeding would have been different. Melendez's *Brady* issue deserves no encouragement

10

such that a hearing is required.  Reasonable jurists could not conclude that Melendez's purported *Brady* evidence placed the case in such a different light as to undermine confidence in the jury's verdict.  As a result, Melendez is not entitled to a COA. Accordingly, this Court DENIES Melendez's application for a COA.